Westlaw.

Not Reported in F.Supp., 1971 WL 572 (E.D.Mich.), 1971 Trade Cases P 73,741
**(Cite as: 1971 WL 572 (E.D.Mich.))**

Page 1

C
United States District Court, E.D. Michigan, Southern Division.
United States
v.
Kelsey-Hayes Co., Motor Wheel Corp., The Budd Co., Gerald E. Doherty, and Anson D. Grimes.

Criminal No. 44608
44608Dated October 26, 1971

KAESS, D. J.
**Opinion Granting Defendants' Motion to Dismiss Criminal Contempt Proceedings**
*1 The present proceeding was instituted on October 20, 1969 by the filing by the Antitrust Division of the Department of Justice of the United States of America of a petition for an order to show cause why respondents should not be adjudged in criminal contempt. An *ex parte* order to show cause was thereupon issued by the late Judge Theodore Levin. The petition charged that during the period from 1962 through 1967, respondents knowingly and "wilfully" violated certain provisions of the Consent Decree entered by Judge Levin on July 1, 1955.[FN1]

> FN1 The Consent Decree was entered in Civil Action No. 10655, instituted in this district in 1951 under the Sherman Act and related primarily to the effect of cross-licensing of patents. The action was terminated in 1955 at the urging of the Court. (Tr. 1/31/55, p. 69) by the entry of a Consent Decree "without trial or adjudication of any issue of fact or law herein and small part of the Consent Decree is directed to the operations of respondent wheel companies relating to the sale and distribution of wheels in the after-market.

The respondents are the three corporations (Kelsey-Hayes, Budd and Motor Wheel) who were defendants in the civil action; Gerald E. Doherty, Manager of the Product Division of Kelsey-Hayes, who came to the Company at Romulus, Michigan, about 1962; and Anson D. Grimes, his counterpart at Motor Wheel, who was with that Company in 1955 or before. The corporate respondents are engaged in the manufacture and sale, among other things, of wheels for automobiles and trucks as original equipment and also for distribution, primarily through some forty or more independent distributors around the country in the after-market. This proceeding relates to certain phases of this after-market distribution.

*Background*
It is undisputed that from the date of the entry of the Decree in 1955 until this proceeding was instituted in 1969, there was no suggestion or notice to respondents by the government that they were in anywise thought to be in violation of the Decree.

Section XI of the Decree of July 1, 1955 provides:

"Jurisdiction is retained for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction and carrying out of this Final Judgment, and for the purpose of enforcement of compliance therewith and the punishments of violations thereof."

No such application has heretofore been made by the government during the 14-year period prior to this proceeding, nor did it ever heretofore suggest to respondents that a possible violation might exist.

In early 1968, the Justice Department convened a Grand Jury at Detroit to investigate the distribution of wheels in the after-market for the period from 1962-1967 to ascertain whether or not there

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1971 WL 572 (E.D.Mich.), 1971 Trade Cases P 73,741
**(Cite as: 1971 WL 572 (E.D.Mich.))**

had been a violation of the antitrust laws in respect thereto. Upon their records being subpoenaed by the Grand Jury in January, 1968, along with others, respondents advised the Department that they were unaware of anything they had done which might be deemed violative of the antitrust law and if the government thought otherwise and would identify the questioned acts, the matter would be immediately investigated and, if indicated, corrective measures taken. The government declined.[FN2]

> FN2 Similar requests were made and declined by the Antitrust Division prior to the institution of this proceeding and thereafter at pretrial hearings on the following dates: 1/22/70, 3/24/70, 6/23/70, 11/30/70, 6/14/71 and 7/28/71.

*2 No indictments were issued by the Grand Jury or recommended by the Department of Justice (Tr. 3/24/70, pp. 32-38; Tr. 11/30/70, pp. 23-24).

The gravamen of the petition for the order to show cause is the alleged violation by respondents of Section VII(B) of the Consent Decree which enjoins respondents from entering into, adhering to, maintaining or furthering any "contract, agreement or understanding with any distributor" with respect to resale prices or terms. Virtually all of the pretrial and discovery proceedings were directed to this question.

### [Alleged Violation]

The petition alleges a violation of Section VII(D) of the Decree concerning the use by the corporate respondents of socalled "X" numbers–composite numbers used as a method of identifying wheels and interchangeable parts produced by more than one manufacturer to assure proper identification and safe application of the wheels and other parts, and also alleged a violation of Section VII(F) directed to the question of whether or not nominal sums which corporate respondents paid to the National Wheel & Rim Association (NWRA) for podium fees to attend NWRA meetings for the purpose of exhibiting and promoting the sale of their products, was "a contribution" prohibited by the Decree, or was for value received. The government conceded that Section VII (F) of the Decree does not prohibit respondents from attending such NWRA meetings.

### Pretrial Procedures, Hearings, and Conferences

At the first pretrial hearing in January, 1970, and throughout, Judge Levin, in keeping with the modern trend for expediting complex cases involving voluminous documents and going back over a long period of time, directed the government to produce documents relied upon, to specify the portions thereof relating to the charge, to meet with counsel for respondents and a court reporter to precisely define and narrow the issues and to ascertain the claims and theories upon which the government relied in respect thereto, all to the end that respondents be fairly apprised of the claims against them, the issues defined and to expedite the proceedings in Court.[FN3]

> FN3 This procedure comports with the recommendations of the Judicial Panel's *"Manual for Complex and Multidistrict Litigation"* (West Publishing Company) May 18, 1970 edition, relating to "Pretrial Procedures in Complex Criminal Cases" Sec. 6.1-6.2, pp 72-76; and decisions of Courts such as *United States v. Tanner,* 279 Fed. Supp. 457 (1967) pp. 478-9.

### [Government Resistance]

It is clear from the transcripts that government counsel resisted the pretrial procedure directed by Judge Levin from the outset and his criticism thereof was sharp[FN4] and, from my observations since I have been in the case, justified. Pursuant to Judge Levin's direction prior to his death, counsel were directed by this Court to meet before a court reporter for the foregoing purposes, on July 6-8, 1971.

> FN4 Judge Levin commented upon the "unwillingness on the part of the government to say what your position is" (Tr.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

3/24/70, pp. 43-5). "You are really evading the responsibility which the Court imposed upon you" (Tr. 6/23/70, p. 18). "I can't understand why there is such unwillingness on the part of the government to cooperate . . . I can't see why there is this obstinacy on your part" (Tr. 6/28/70, p. 54). "There is no excuse for you not doing it now" (Tr. 6/18/70, p. 54). "It's like pulling molasses taffy to get something out of you and your Department on this point (Tr. 6/28/70, p. 56). "If I think that there has been a reluctance on your part to hold back, and if I think that the respondents have been reasonable, I am going to order a pretrial in this building . . . that will take a week, two or three weeks or a month" (Tr. 6/18/70, p. 57). Such a direction was made by the Court on November 30, 1970.

*3 Based upon admissions of basic facts and claims of position exacted from government counsel during the pretrial and discovery proceedings, respondents filed a motion to dismiss this criminal action and a separate application in the Civil Action No. 10655 to construe and for appropriate instructions to carry out the provisions of the Consent Decree of July 1, 1955. Voluminous briefs were filed and oral arguments were heard on October 5, 1971.

In my opinion, each motion of respondents should be granted, on the grounds therein set forth.

The admissions of the government and claims of position in respect to the issues in the case clearly make it apparent that the government cannot as a matter of law sustain the charges made in the petition. Nor would the public interest or the dignity and authority of this Court be served by a further protracted proceeding.

[*Government Concessions*]
The government concedes that in respect to the claim of price agreements with distributors, claimed to be violative of the Decree–

1. There was no horizontal conspiracy or agreement by respondent manufacturers.

The petition alleging criminal contempt, originally filed on October 20, 1969, appears to be predicated upon the basis that there was (a) a horizontal conspiracy between the respondents to violate the Decree as well as (b) vertical agreements between respondents and the distributors and the NWRA. (Tr. 6/14/71, pp. 11-12). However, over eight months thereafter, the then chief trial counsel for the government in this case conceded that there was no horizontal charge at the pretrial hearing of June 23, 1970, stating:

"Petitioner does not intend to prove a conspiracy between or among corporate respondents, nor between the individual respondents." (Tr. 6/23/70, p. 47; see pp. 45-47.)

This was again confirmed by his successor (Tr. 11/30/70, pp. 42-3, 54).

2. There was no "secret, clandestine activity" by respondents nor effort to "hide" or "conceal" (Tr. 7/7/71, pp. 255-57; Tr. 10/5/71, p. 45; see Tr. 3/24/70).

At the oral argument on October 5, 1971, counsel for the government acknowledged that "its hard to characterize them [the acts of respondents] as vicious or overt" (Tr. 10/5/71, p. 80) and stated that they make no claim of a "hard-core," sinister, secret price-fixing, such as obtained in the General Electric cases (Tr. 10/5/71, p. 96). In response to a query from the Court, government counsel was unwilling to characterize respondents as "criminals," "bad eggs" (Tr. 10/5/71, pp. 104-5).[FN5]

> FN5 Government counsel admitted that generally in antitrust cases, the Justice Department's policy was not to institute criminal proceedings unless there was a horizontal, hard-core, pricefixing agreement (Tr. 6/14/71, p. 30).

3. The Decree did not prohibit any respondent

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1971 WL 572 (E.D.Mich.), 1971 Trade Cases P 73,741
**(Cite as: 1971 WL 572 (E.D.Mich.))**

Page 4

from issuing its suggested resale prices to its respective distributors. (Tr. 7/7/71, p. 92; Tr. 10/5/71, p. 96)

4. Respondents did not require any distributor to follow their suggested resale prices. (Tr. 7/7/71, pp. 108-09; 94-109; Tr. 10/5/71, p. 96; Bill of Particulars, p. 15.)

*4 5. No respondent terminated any distributorship or otherwise coerced any distributor for failure to follow such respondent's suggested resale prices (Tr. 7/7/71, 1.111 Tr. 10/5/71, p. 96.)

6. It was not a violation of the Decree for respondent manufacturers to discuss market problems with their respective distributors separately or collectively (40 in number) or for any distributor to follow such manufacturer's recommendations in whole or in part. (Tr. 7/7/71, pp. 145-51, 154-58, 165-68.) Conversely, it was not a violation of the Decree for distributors to make suggestions or criticisms for revision of the respondent manufacturer's practices or marketing policies and for the respondent manufacturer to follow such suggestions in whole or in part (Tr. 7/7/71, pp. 158, 166-68).

7. Separate advisory councils set up by respondents, Kelsey and Motor Wheel, respectively, consisting of a representative cross-section of their respective distributors throughout the country and respondents for the purpose of discussion of marketing problems of the distributors, were not violative of the Decree–absent agreement or understanding. (Tr. 7/7/71, pp. 191-194.)[FN6]

> FN6 It was held in *Susser v. Carvel Corp.* [1964 TRADE CASES P 71,103], 332 F. 2d 505 (2nd Cir. 1964), certiorari dismissed as improvidently granted, 381 U. S. 129 (1965), that the manufacturer did not violate the Sherman Act–notwithstanding
>
> "the existence of a board of governors consisting of various dealers appointed by Carvel, the function of which is to make recommendations concerning the suggested retail selling price of Carvel products . . . the board of governors operated primarily as a medium for the interchange of ideas among a representative group of individual franchise dealers . . ." (p. 510)

The Court concluded that–

> "[T]he mere existence of a means whereby retail price levels are recommended is not sufficient to establish a violation of the Sherman Act, unless there is a showing of an attempt to enforce a price structure upon the retail tradesmen." (p. 510)

In the instant proceeding, the government admitted that there was no requirement to follow suggested resale prices, nor threats nor coercion in respect thereto.

8. No agreement or understanding was entered into at any meeting, or indeed on any given occasion between any respondent and its distributors about suggested resale prices or terms of sale which was claimed to be violative of the Decree (Tr. 7/8/71, pp. 266-67, 269-70, 312-14).

[*Totality of Conduct*]
The government, however, contended that such acts as the foregoing, none of which are claimed to be violative of the Decree, in and of themselves, might add up in their totality to a "course of conduct" which by operation of law at some unspecified time, constituted an "agreement." (Tr. 7/7/71, pp. 139, 160, 196, 235-36); (Tr. 7/8/71, pp. 266-270, 299, 308, 312-14). There was no claim that there was a single "course of conduct" engaged in by all respondents, but instead, the government, disclaiming a horizontal conspiracy between respondents, conceded that it based its case upon three "different" separate and distinct "courses of conduct" by each corporate respondent (Tr. 7/8/71, p. 276).

*5 Counsel for the government at the oral argu-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1971 WL 572 (E.D.Mich.), 1971 Trade Cases P 73,741
**(Cite as: 1971 WL 572 (E.D.Mich.))**

Page 5

ment on October 5, 1971 was unable to state "what the course of conduct" was that the government claimed constituted a violation of the Decree to fairly apprise respondents with what they were being criminally charged. Although the proceeding had been pending for almost two years, and after a Grand Jury investigation, government counsel stated that "I find it difficult, your honor, to do so without preparing for trial." (Tr. 10/5/71, p. 100.)

The Court is of the opinion that it is clear from admissions, concessions and claims of position of the government that it cannot establish that respondents are guilty of wilful violation of the Consent Decree and that there is a fatal lack and showing of probable cause. As the Ninth Circuit held in *In re Floersheim* [1963 TRADE CASES P 70,756], 316 F. 2d 423 (9th Cir. 1963) (per Barnes, J.):

"On the record before us, we cannot find the respondent guilty of contumacious conduct, wherein and whereby he intentionally, flagrantly, deliberately and recklessly violated the court's order. We find him not guilty of criminal contempt." (316 F. 2d at 428)

In view of the concessions and admissions made by the government, I find that probable cause of a "wilful" violation of the Decree is clearly lacking in this case.

In *United States v. Univis Lens Co.* [1950-19511 TRADE CASES P 62,571], 88 F. Supp. 809 (S. D. N. Y. 1950) under facts comparable to those here conceded, the Court rejected the government's "course of conduct" theory as being insufficient to establish an agreement to fix resale prices and to constitute a wilful, intentional violation of the decree by respondents there. Similarly in the case at bar, as has been pointed out above, the government is not claiming that any act of the respondents standing alone was violative of the Decree, but the aggregation thereof constitutes an unlawful "course of conduct" and "wilful" violation of the Decree. *Univis* denied such contention. The basic facts upon which *Univis* was predicated are here conceded. A protracted trial to establish such facts would be unwarranted and futile.

In *United States v. Kroger Grocery & Baking Co.,* 163 F. 2d 168 (7th Cir. 1947), the Circuit Court reversed a judgment of criminal contempt. In *Kroger,* the wrongful acts were admitted, but respondents argued that the wrongful acts were not knowingly or intentionally committed. The government argued that "The law in a case of the instant character imputes intent," (p. 173). However, the Seventh Circuit held that "specific wrongful intent" was required, not "imputed intent," (pp. 173-74). Applying the holding in *Kroger* to the case at bar, a specific wrongful intent cannot as a matter of law be inferred from a "course of conduct," where the government concedes that it is not claiming that an agreement was reached at any meeting or that any act of the respondents, standing alone, was violative of the Decree.

[*Authority to Dismiss*]
This Court has ample authority to dismiss this proceeding prior to trial. Since the purpose of criminal contempt proceedings is to vindicate the authority of the Court, *Gompers v. Buck's Stove & Range Co.,* 221 U. S. 418, 441 (1911), the Court has the exclusive power, discretion, and authority to institute or dismiss, at any stage thereof, a criminal contempt proceeding where its "dignity and authority" have allegedly been impugned. In *United States v. Barnett,* 346 F. 2d 99 (5th Cir. 1965), the Fifth Circuit stated:

*6 "Criminal contempt is a *sui generis* proceeding for the protection of the integrity of the Court . . . *Those proceedings* are, therefore, *within the control of the Court and the Court has the power and authority to order them dismissed."* (p. 100) (Emphasis furnished)

". . . considerations of respect for the Court do not require further prosecution of the criminal contempt proceedings (p. 100) . . . no public interest was to be served in continuing the proseution." (p. 101)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1971 WL 572 (E.D.Mich.), 1971 Trade Cases P 73,741
**(Cite as: 1971 WL 572 (E.D.Mich.))**

Page 6

See *In re United Corp.,* 166 F. Supp. 343 (D. Del. 1958) where a dismissal of a criminal contempt action was for "lack of probable cause."

*Bloom v. Illinois,* 391 U. S. 194 (1968), cited by the government does not negate the proposition that criminal contempt proceedings are *sui generis* or that a Court has control over the proceedings throughout, including the power to dismiss. *Bloom* only provides for a constitutional safeguard of a jury trial to prevent abuses by a Court in the exercise of its "unbridled power to punish" in the trial of certain types of "serious" criminal contempt proceedings where the Court proceeds to trial. *Bloom* is hardly authority for the proposition that the Court is without power to dismiss prior to trial, but is compelled to try a criminal contempt proceeding, where, as here, it is clear that the action must fail.

Criminal contempt proceedings are *sui generis* –different from the ordinary criminal proceeding. FN7 The Court, whose authority or dignity is impugned, has the inherent power to control criminal contempt proceedings, including the authority to order them dismissed at any time *before* trial or thereafter when he concludes that the government's admission of basic facts and statements of position are such that it is manifest to the Court as a matter of law that there was no wilful contumacious violation of the Consent Decree by respondents and that, at all events, there is a lack of probable cause or that further prosecution will not serve the public interest and is unnecessary to safeguard or preserve the "authority or dignity of the Court" or its orders.

> FN7 The Court, notwithstanding the wish or position of the Attorney General or District Attorney, has the power to decide at the outset or at any stage, whether (a) the Court should proceed with a criminal contempt proceeding, (b) to discontinue or maintain such proceeding, or (c) to dismiss a proceeding, "untrammeled by the action of another branch of the government." *Ex parte McLeod,* 120 Fed. 130, 143 (N. D. Ala. 1903); *O'Malley v. United States,* 128 F. 2d 676 (8th Cir. 1942) pp. 684-5; reversed on other grounds 317 U. S. 412; *United States v. Schine,* 260 F. 2d 552 at p. 551 (2nd Cir. 1958); cert. denied 358 U. S. 934 (1959); *Mayers v. United States,* 264 U. S. 95 at p. 103 (1924); *In re Fletcher,* 216 F. 2d 919 at p. 917 (4th Cir. 1954); cert. denied 75 Sup. Ct. 347 (1955) and *U. S. v. Barnett* (supra).

In my judgment, Rule 42 of the Rules of Criminal Procedure is here controlling and it and 18 USCA Sec. 401 are to be construed in conformity with the longestablished common law concept set forth immediately hereinabove. To the extent that other rules of the Rules of Criminal Procedure are not inconsistent with the foregoing, they may be applied, not otherwise.

*7 At all events, even if criminal contempt were, as ordinary criminal cases, governed by Rules 12 and 29, there is a significant exception to such rules. In *United States v. Maryland Cooperative Milk Producers,* 145 F. Supp. 151 (1956), Judge Holtzoff held in a criminal antitrust case at p. 152:

"A word should be said about the procedural aspects of the matter. Ordinarily, such a motion, unless based solely on the opening statement of government counsel, may not be entertained until the government closes its case. An exception is proper, however, *if at an earlier stage basic facts appear inescapably leading to the conclusion that, irrespective of whatever other evidence may be introduced, the prosecution must fail. In that event, it is proper to stop the further introduction of evidence and entertain a motion for judgment of acquittal.* Such a course is *in the interest of efficiency and expedition in the administration of justice.* It is on this basis that the Court entertained the defendants' motion in this instance as soon as the stipulation of facts was tendered and admitted." (Emphasis furnished)

The government here concedes that respondents did not participate in a clandestine, secret, col-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1971 WL 572 (E.D.Mich.), 1971 Trade Cases P 73,741
**(Cite as: 1971 WL 572 (E.D.Mich.))**

Page 7

lusive or predatory conduct, "it is hard to characterize them [their conduct] as vicious or overt" and there is no claim of a hard-core, sinister price-fixing agreement, as obtained in the *General Electric* cases. There is no claim of a deliberate, "flagrant" violation. The most the government asserts is vague "course of conduct" which it has failed to specify. Under such circumstances, the Court has the power and duty to dismiss this criminal contempt proceeding. It is not obliged to devote months of time at a trial reviewing thousands of documents, when it is fully satisfied that the petitioner could not prevail. Nor would it be in the public interest for the Court so to do in view of the already overcrowded dockets—nor effectuate the pressing goal of more efficient administration of the Courts.

[*Appropriate Procedures*]
Under the circumstances of this case it would appear that if government counsel is of the view that acts of respondents might be violative of the Decree entered sixteen years ago, they should review the matter with respondents' counsel looking toward a resolution thereof, failing which the Court, under the provisions of Article XI of the Decree, upon notice and hearing, will interpret the disputed provisions of the Decree or questioned acts thereunder.

Article XI of the Decree, I am advised, is a provision included in almost every Decree with the Antitrust Division entered by consent or after adjudication, reserving to the Court jurisdiction to interpret and construe provisions of the Decree or acts of respondents thereunder which may thereafter be in dispute. It is thereby contemplated that counsel for the parties should endeavor to see if the matter can be settled in an informal way, failing which they may proceed formally upon petition, notice and hearing to obtain an interpretation and construction from the Court, where, as here, admittedly there is no clandestine, predatory, sinister or flagrant conduct involved. Otherwise there would not be sufficient courts in the land to handle hearings in respect to the many decrees outstanding under which differences might arise. This would hardly be in the public interest.

*8 Respondents' Motion To Dismiss the criminal contempt proceeding is hereby granted upon the ground therein stated.[FN8]

> FN8 The allegations in respect to the composite "X" numbers and to podium fees Sections (D) and (F) of the Decree, discussed hereinbefore, raise questions of construction and application of the Decree which should be resolved, if necessary, under Article XI of the Decree and, under the circumstances related, not in the criminal contempt proceedings.
>
> As to "X": numbers of interchangeable parts made by competing manufacturers in the automotive after-market, the Federal Trade Commission in an advisory opinion ruled that such a composite publication by itself is not violative of the antitrust laws. *Tweedle Litho Co.,* CCH TRADE REGULATION REPORTS, P 19,706 (July 15, 1971).

Defendants' Application in Civil Action No. 10655 for an order directing plaintiff to file herein a statement precisely and specifically setting forth what acts and conduct of each plaintiff believed to be, and has been, violative of said Decree, with leave to defendants to respond thereto and to be heard thereupon by this Court for entry of an appropriate order as to any points the parties are unable to resolve amongst themselves, is hereby granted.

While recognizing the importance of enforcing antitrust decrees, it offends my judicial sense of common everyday fairness to have respondents charged with *criminal* contempt on a Consent Decree outstanding for over fourteen years, without notice or even an intimation to them by the government of a claimed violation or a good faith attempt to resolve any differences there may be, where it is conceded that their alleged acts are neither clandes-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1971 WL 572 (E.D.Mich.), 1971 Trade Cases P 73,741
**(Cite as: 1971 WL 572 (E.D.Mich.))**

Page 8

tine nor sinister, and the charges are vague and tenuous and at best technical.

Appropriate orders may be submitted to the Court for entry to give effect hereto.


E.D.Mich. 1971.
U.S. v. Kelsey-Hayes Co.
Not Reported in F.Supp., 1971 WL 572 (E.D.Mich.), 1971 Trade Cases P 73,741

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.